UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Mr. Cody D. Bond<br>650 Dixon Blvd, Apt 5A<br>Cocoa, FL 32922<br>Airman<br>U.S. Air Force<br><br>      Petitioner<br><br>  v.<br><br>The Honorable Frank Kendall III<br>Secretary of the Air Force<br>1670 Air Force Pentagon<br>Washington, D.C. 20310-0101<br><br>The Honorable Lloyd J. Austin III<br>Secretary of Defense<br>1400 Defense Pentagon<br>Washington, D.C. 20310-1000<br><br>And, United States of America<br>(No address needed)<br>      Respondents | Case No.:    1:22-cv-00951<br><br><br><br>COMPLAINT FOR DECLARATORY<br>RELIEF ON BEHALF OF PETITIONER |

**COMPLAINT FOR DECLARATORY JUDGEMENT**

     Comes now, Petitioner, Cody D. Bond ("Petitioner"), by and through counsel, to request that this Court vacate his convictions for sexual assault under Article 120, Uniform Code of Military Justice ("UCMJ"), and for wrongfully communicating a threat under Article 134. On June 25, 2015, he was convicted of those charges at Court Martial, alongside a charge he plead guilty to of dishonorably failing to pay a debt under Article 134. He was sentenced to reduction to the grade of E-1, confining for 10 years, and dishonorable discharge. ROT 1108. Another one of his convictions was overturned on appeal to the Air Force Court of Criminal Appeals ("AFCCA"), in which upheld his other charges on June 7, 2017, in *United States v. Cody D.*

*Bond*, No. ACM 38394 ("ACM 38394"). Petitioner received supervised release on January 27, 2021.

Petitioner's conviction for sexual assault and for wrongfully communicating a threat were replete with grave legal errors and requires vacating on multiple grounds. First, his conviction under Article 134 for wrongfully communicating a threat was heavily dependent on medical records ordered released in violation of Military Rule of Evidence 513, which imposes a psychotherapist-patient privilege. Second, the AFCCA did not give full and fair consideration to Petitioner's appeal of the Article 134 charge because it's opinion openly cited evidence specifically found to have been hearsay at trial as justification for upholding the charge. Third, his conviction under Article 120 occurred due to the fact that the Government interpreted the elements of a charge for aggravated sexual assault under the UCMJ in a manner that rendered the separate element of "bodily harm" superfluous. This was in blatant violation of Supreme Court precedent banning interpreting of statutes in a manner that produces surplusage unless there is no other option. All three of these grave legal errors require that Petitioner's convictions for the two crimes be vacated, and that Petitioner's characterization of service be upgraded to "General" to reflect the fact that he was only separated for failing to pay a debt, a charge he plead guilty to.

**I.  JURISDICTION AND VENUE**

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal jurisdiction question), 1346(a)(2) (civil action against the United States…founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department….), and 1361 (action to compel an officer or employee of the United States to perform his duty). *Hatheway v. Secretary of the Army*, 641 F.2d 1376, 1379-80 (9th Cir. 1981), *cert. denied*, 454 U.S. 864 (1981).

2. Under 28 U.S.C. § 2201(a), "[i]n a case of actual controversy within its jurisdiction, any court of the United States…may declare the rights and other legal relationships of any interested party seeking such declaration, whether or not further relief is or could be sought."

Under 28 U.S.C. § 1361, the court may issue any "an order to compel an officer or employee of the United States to perform his duty."

3. Venue in this district is proper pursuant to §§ 1391(e) and 1402(a) because one of the Defendants is located in the district and no real property is involved in the action.

## II. THE PARTIES

4. Petitioner was an Airman (E-2) in the United States Air Force.

5. Respondent Frank Kendall III acts on behalf of the United States of America in his official capacity as the Secretary of the Air Force.

6. Respondent Lloyd Austin acts on behalf of the United States of America in his official capacity as the Secretary of DC.

7. Respondent United States of America is the U.S. government and opposing party in Petitioner's court-martial, captioned *United States v. AMN Cody D. Bond*.

## III. STATEMENT OF FACTS

8. Given that several charges against Petitioner were either dropped before trial, resulted in acquittal, or were vacated on appeal, the statement of the facts will concentrate solely on the facts pertaining to the charges still in controversy.

9. Facts pertaining to specific legal issues will be discussed alongside how the issues were treated at trial.

10. Growing up, Petitioner had a severely emotionally abusive stepmother. Record of Trial (ROT) 1066-9.

11. He joined the Air Force in order to escape his stepmother but struggled psychologically within the military due to his harsh upbringing. ROT 1067.

12. This resulted in being committed to psychiatric hospitals four times over the two years prior to his court martial. ROT 1064.

13. Petitioner and KB met in the early summer of 2012, began dating in August of 2012, and were engaged in October of 2012. ROT 680, 682.

14. For the first time in his life, Petitioner felt that someone actually cared for him and believed that he had something to offer. ROT 1064.

15. The two married in May of 2013, less than a year after they met. ROT 681.

16. Following their religious ceremony in June of 2013, they moved in with KB's parents. ROT 619.

17. Within a month of the ceremony, the couple was expecting their first child. ROT 1064.

18. In October of 2013, the couple moved into their first home together in base housing at Air Force Base Sam Houston. ROT 619.

19. KB wasn't working, and the couple was relying on Petitioner's salary alone, resulting in financial struggles emerging within only a few months. ROT 682, 740.

20. Due to an inability to communicate regarding their budget, finances soon become a major source of stress and tension within their marriage, which extended to the couple struggling to afford food at times. ROT 624-5.

21. A week prior to the birth of their first child, a daughter, KB returned to her parents' home, in order to have someone with her at all times who could take her to the hospital. ROT 635, 648.

22. She also felt that the couple could no longer afford to live on their own. ROT 637.

23. Following the birth of their daughter, on April 19th, 2014, the family returned to KB's family home. ROT 635, 648.

24. There they lived with KB's parents, as well as with her three siblings and her five cousins which the family was fostering. ROT 637.

25. Petitioner greatly struggled with this living arrangement and was deeply unhappy. ROT 1064.

26. He felt as if he was losing control and began having suicidal ideations. *Id.*

27. On June 2nd, 2014, KB was informed that it was safe for the couple to have sex again. ROT 639.

28. During the night, Petitioner attempted to initiate sexual activity. ROT at 642.

29. The first time, KB declined, but, the second time, she consented. ROT at 643-4.

30. The sex became painful, and KB asked Petitioner to stop, but he did not. ROT 644.

31. At no time at trial was there any evidence presented at any of the other physical contact occurring at that moment was nonconsensual or unwanted, barring the sexual act itself. *Id.*

32. From July 11th to July 12th, the couple were at an extremely high tension due to financial pressures. ROT 647-8.

4

33. This culminated in a screaming match where Petitioner attempted to remove himself from the situation by packing his stuff up and leaving. ROT 658-9.

34. Petitioner asked for his firearm, which had been hidden by a doctor's request due to his suicidal ideations. *Id.*

35. When told he wouldn't be given it, he stormed out of the home, but KB followed him outside. ROT 659.

36. Her parents convinced them to return inside the home, at which point the argument progressed to the library. *Id.*

37. KB's father attempted to separate the couple, at which point Petitioner stated, "you're lucky I don't have my gun right now." ROT at 660.

38. The argument was immediately ended, and KB's parents took over. ROT 661.

39. KB's parents took Petitioner, and his firearm, to the San Antonio Military Medical Center ("SAMMC"), though they never called the police. ROT 817, 830.

**The statements by Petitioner's mother over the phone during the argument.**

40. Immediately after Petitioner made the statement of "you're lucky I don't have my gun right now," KB pushed him down into a chair and the argument immediately ceased. ROT 660-1.

41. With the family all in the room, Petitioner called his mother on speaker phone and told her "I did it." ROT 661.

42. This was in relation to an alleged conversation the two had had that morning concerning Petitioner's intent to harm the family. *Id.*

43. When the prosecution (Trial Counsel or "TC") attempted to enter this conversation into evidence through KB relaying what Petitioner's mother had stated over the phone, this was immediately stopped via objection by Defense Counsel ("DC") on the grounds of hearsay. *Id.*

44. This resulted in a ruling by the Military Judge ("MJ") that the statement, a situation of *double* hearsay (Petitioner to his Mother to KB to the jury), was inadmissible hearsay. ROT 667.

45. Stunningly, however, the AFCCA specifically cited this statement from Petitioner's mother, specifically held to have been hearsay at trial, in substantial depth when upholding the legal and factual sufficiency of Petitioner's conviction. ACM 38394 at 8.

**Petitioner's mental health records from that night at the hospital.**

46. As stated previously, Petitioner was taken to the SAMMC, where he made several statements expressing both suicidal ideation and a desire to hurt KB and her family during his initial treatment that night. ROT 735.

47. At trial, the TC heavily sought to establish KB and her family's perception as to what the statement of "you're lucky I don't have my gun right now." *See, e.g.,* ROT 660, 668.

48. On cross-examination, DC asked KB if she was or was not aware of Petitioner's previous treatment for suicidal ideations. ROT at 697-8.

49. When the Prosecution objected, DC explained that this was purely to establish KB's personal knowledge as to Petitioner's previous medical problems, in order to challenge the Prosecution's presentation of her perception of the statement. *Id.*

50. DC made it clear that the truth of Petitioner's mental state at the moment was not being raised, rather it was purely the family's perception of Petitioner's mental state, as shaped by their contextual knowledge. ROT 698-9.

51. Despite the MJ explicitly recognizing this, and that DC was not raising it as an affirmative defense, the MJ still ruled that DC had raised Petitioner's mental condition at the time as defense, extenuation, or mitigation, and ruled that Petitioner's medical records from his admission to the SAMMC be released. ROT at 705.

52. These statements formed a substantial part of the prosecution's argument, including during closing. *See* ROT 959.

53. This was upheld on appeal by the AFCCA. ACM 38394 at 10-12.

**Petitioner pleads guilty at trial to a charge of dishonorably failing to pay a debt, though without the enhancing element of "to the prejudice of good order and discipline in the armed forces."**

54. On October 3, 2014, Petitioner attempted to purchase a 2014 Hyundai Elantra, while knowingly having insufficient funds in his account for the check to clear. ROT 1016.

55. Due to this, Petitioner was charged under Article 134 for having dishonorably failed to pay a debt, to the prejudice of good order and discipline in the armed forces. ROT 311.

56. Petitioner plead guilty to this charge at court-martial, in return for the language concerning prejudice to good order and discipline being dropped from the specification. ROT 324.

### III.   STATEMENT OF THE CASE

57.  At the general court-martial, beginning on June 25, 2015, Petitioner was charged with two specifications of having violated UCMJ Article 120: Sexual Assault, for two alleged sexual assaults occurring between February 1st and 28th, 2014, and between June 1st and 23rd, 2014, respectively, one specification of allegedly violating UCMJ Article 134 through dishonorably

6

failing to maintain sufficient funds for the payment of a check, and three specifications for allegedly violating UCMJ Article 134 by communicating threats.

58. Petitioner was convicted at trial for one of the UCMJ Article 120 violations for sexual assault, for allegedly having assaulted KB between June 1st and 23rd, 2014, and two specifications of communicating a threat, for his alleged threat to Kristen Bond on June 12th, 2014, and for allegedly communicating in December to another service member a threat to harm KB.

59. In addition, as discussed previously, Plaintiff plead guilty to the Article 134 specification for dishonorably failing to maintain sufficient funds to pay for a check.

60. On appeal to the United States Air Force Court of Criminal Appeals, in *United States v. Bond*, No. ACM 38934, Petitioner raised six counts of error:

    (1)   The MJ's release of Plaintiff's medical records into evidence in violation of MRE 513;

    (2)   That the second charge of communicating a threat under Article 134 was conditional bravado;

    (3)   That the MJ's reasonable doubt instruction was in error through the language of "must convict" (argument rendered moot by the United States Court of Appeals for the Armed Forces' ruling in *United States v. McClour*, 76 M.J. 23 (C.A.A.F. 2017) a few months prior to the decision);

    (4)   Whether KB's victim impact statement's reference to "multiple" sexual assaults during sentencing, when Petitioner was only convicted of one, was an error;

    (5)   Whether there was an unreasonable delay between sentencing and post-trial processing; and

    (6)   Whether Petitioner's conviction for sexual assault was legally and factually sufficient.

61. The AFCCA set aside the finding of guilt for the second alleged threat communicated to the service member in December, while upholding the rest of the convictions. ACM 38934 at 16.

62. The final state of the conviction was thus for one count of allegedly violating Article 120 through sexually assaulting KB in June 2014, one count of allegedly violating Article 134 for wrongfully communicating a threat in June 2014, and one count, to which Petitioner plead guilty to, of dishonorably failing to pay a debt.

63. Petitioner was sentenced at trial to reduction to the grade of E-1, confining for 10 years, and dishonorable discharge from the service. ROT 1108.

64. Petitioner received supervised release on January 27, 2021 and has completed his confinement. Exhibit 1, Supervised Release Papers.

## IV. SCOPE OF REVIEW

65. "In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

66. "The Government must obey its own laws." *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979). "Military departments are not immune from the proscription that they are not at liberty to ignore the law, and that agency actions in contravention of the Constitution, applicable statutes and regulations, are unlawful." *Id*., citing *Vitarelli v. Seaton*, 359 U.S. 535, 539 (1959); *Harmon v. Brucker*, 355 U.S. 579, 582 (1958); *Service v. Dulles*, 354 U.S. 363, 379 (1957); *Geiger v. Brown*, 419 F.2d 714, 717-19 (D.C. Cir. 1969); *Roberts v. Vance*, 343 F.2d 236, 240 (D.C. Cir. 1964).

67. "A 'controversy' must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937). A federal court may review a court-martial conviction for constitutional and/or jurisdictional error in a suit for declaratory and injunctive relief by one not in confinement. *Davis v. Marsh*, 876 F.2d 1446 (9th Cir. 1989); *Homcy v. Resor*, 455 F.2d 1345 (D.C. Cir. 1971).

68. "[T]he deprivation of liberty under an invalid conviction is a grievous injury, but a military discharge under other than honorable conditions impose a lifelong disability of greater consequence for persons unlawfully convicted by courts-martial." *Kaufmann v. Secretary of the Air Force*, 415 F.2d 991, 995 (D.C. Cir. 1969).

69. A court-martial is "one of those inferior courts of limited jurisdiction whose judgments may be questioned collaterally." To give effect to its sentences it must appear affirmatively and unequivocally that the court was legally constituted; that it had jurisdiction; that all the statutory regulations governing its proceedings had been complied with, and that its sentence was conformable to law. *McClaughry v. Deming*, 186 U.S. 49, 63 (1902).

## V. CLAIMS

**Claim I:   The AFCCA erred in not finding that the trial court's admission of Plaintiff's statement to Emergency Department Staff into evidence was an error.**

70. Whether a Court of Criminal Appeals (CCA) conducted a legally sufficient Article 66, UCMJ, review is a question of law this Court reviews *de novo*. *United States v. Leak*, 61 M.J. 234 (C.A.A.F. 2005).

71. A military judge's ruling as to the release of material covered by the Military Rules of Evidence (MRE) is reviewed under the abuse of discretion standard.

72. Such a ruling will be overturned if the findings of fact underpinning it are clearly erroneous, or if the court's decision is influenced by an erroneous view of the law. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008).

73. As Defense objected to the medical records being released at trial, the standard remains clearly erroneous, not plain error. *United States v. Eslinger*, 70 M.J. 193, 197-8 (C.A.A.F. 2011).

74. On collateral review, the standard is for the merit of the claim to be reviewed with some deference to the Military Court. *Sanford v. United States*, 586 F.3d 28, 32 (D.C. Cir. 2009).

75. Under the Manual for Courts Martial 2012 ("MCM 2012") Military Rule of Evidence 513 grants a psychotherapist-patient privilege to confidential communications made between the patient and a psychotherapist, or the psychotherapist's assistant, if such communication was made for the purpose of facilitating diagnosis or treatment of the patient's mental or emotional condition.

76. There is an exception to this privilege under MRE 513(d)(7) when an accused offers statements or other evidence concerning their mental condition in defense, extenuation, or mitigation.

77. If such a statement or evidence is offered for such purposes, the judge may order disclosure of a statement made to a psychotherapist as may be necessary in the interests of justice.

78. A necessary element of an Article 134: Wrongful Communication of a Threat charge is that a reasonable person must have understood the communication as a threat within the context of the situation. UCMJ Article 134(b)(1); *See United States v. Martinez*, 2012 CCA LEXIS 324 at *11-2 (C.A.A.F. 2012).

79. Establishing the context of a situation, in order to determine whether a reasonable person would have understood the communication as a threat, requires establishing the knowledge or awareness of the person to whom the threat was communicated.

80. At trial, the TC questioned KB as to her state of mind after Petitioner made the statement to her "you're lucky I don't have my gun right now":

    "Q. And what was the reaction by everyone?
    A. Everyone stopped. It was just like – there was just a moment of just – there was just like a pause, someone hit a pause button.
    Q. *How did you feel?*
    A. Why would someone say that is kind of what was going through my mind. And— and he has a gun. And I was lucky he didn't' have it at the moment." ROT 660.

81. This was part of the TC's general efforts to establish the context of how the parties in the room interpreted Petitioner's statement.

9

82. This was necessary to establish both the subjective elements of the Article 134 charge, that Petitioner had intended for the communication to be a threat, and the objective element of the Article 134 charge, that, a reasonable person, in the context of the argument with the knowledge KB had, would have interpreted it as a threat.

83. The TC also attempted to add the statement by Petitioner's mother into evidence in order to reinforce both the subjective and objective elements of the charge. *See* ROT 668 ("Also, I mean, it does go to show the effect on the listener. The listener are – the listeners are the folks that are sitting around the table and why they took what he said right before that so seriously.")

84. This was found to be hearsay by the MJ. ROT 607.

85. On cross-examination, DC questioned KB as to her interpretation of Petitioner's statement:

    Q.   And you told him, "You're going to threaten me now"?
    A.   I think I said that.
    Q.   And you knew that Cody had threatened to commit suicide before?
    A.   I assumed.
    Q.   You knew he had been hospitalized because of suicidal thoughts? ROT 697.

86. When TC objected, DC specifically informed the Court that the sole purpose for their questioning was to establish KB's interpretation of the statement. ROT 698.

87. This resulted in an Article 39(a) session.

88. During the session, TC alleged that DC had placed Petitioner's mental health at issue. ROT 699.

89. However, DC repeated that they were only seeking to establish KB's *knowledge* of Petitioner's mental health. *Id.*

90. As previously noted, the contextual interpretation by a reasonable person is a necessary element of an Article 134 threat charge, and Prosecution had previously heavily focused on the interpretation of the parties in the room as to the communication. ROT 660, 668.

91. DC followed up by reinforcing that the knowledge of previous suicidal ideation was not being offered for the truth of whether Petitioner was suicidal at that moment, but whether KB and her family, and, by extension, a reasonable person in their position and with their knowledge, would interpret the comment as a threat to them. ROT 700.

    > "We're not offering them for the truth of whether or not there were actual suicidal ideations, rather the witness's knowledge of that possibility in her ability to understand what the statement that was being made was; not the truth of whether they actually did occur."

92. DC, during the Article 39 hearing, further stated that the sole purpose of the question was to "provide some context as to the witness' *perception of the statement*." ROT 705 (Emphasis added).

93. The point of the question was not to raise an affirmative defense as to Petitioner's mental state at the time, but rather to challenge the TC's characterization of the perception of the recipients of the communication in the room of said statement, i.e. as part of the objective, not subjective, element of the charge. *Id.*

94. The MJ even specifically stated that he understood that that was what DC was doing, and yet still ordered Petitioner's records released on a theory that DC had placed Petitioner's mental state at issue. *Id.*

95. It is true that the argument was an "extenuation and mitigation of that particular statement," but only from the perspective of the objective element of how a reasonable person in the context, with KB's knowledge, would treat the statement. *Id.*

96. Petitioner's mental state at the time was thus not actually raised by DC and finding that it had been clearly erroneous by the MJ.

97. Based on that clear error, the MJ made another clear error in releasing Petitioner's medical records from that night, in violation of M.R.E. 513(b)(7).

98. Petitioner's rights were substantially impacted by this error, as the records from later that night played a key role in the TC's closing arguments:

> "Members, he wasn't talking about killing himself, he was talking about killing his wife. And how do we know that with absolute certainty? This is how we know it. Because you know what? When he goes to the ER in the early morning hours after her parents take him there, he tells them that: 'On evaluation, the patient continues to express strong urges of homicidal thoughts towards his wife and his in-laws reporting he intends to carry out his plan to kill them when he gets discharged.'" ROT 959.

> "But the beauty of it is you don't have to take the government's word for it. You have the records that I showed you on the screen. You have copies of them in front of you so you know exactly what he was thinking. It wasn't any kind of suicidal thought that day when he threatened those people. It was that he wanted to kill them." ROT at 979-80.

99. This error rendered Petitioner's conviction under Article 134 for allegedly wrongfully communicating a threat void because it was a fundamental legal error that violated Petitioner's due process rights. *See Luke v. United States*, 942 F. Supp. 2d 154, 163 (D.D.C. 2013).

**Claim 2:** The AFCCA failed to give full and fair consideration to Plaintiff's claim that the evidence for the Article 134 wrongfully communicating a threat charge

11

> was legally and factually sufficient because it based its holding in part upon evidence which had been ruled to be hearsay at trial.

100. Petitioner raised the factual and legal sufficiency of the Article 134 charge against him from June 2014 on appeal.

101. The sufficiency of the charge against him was of a substantial constitutional dimension and was an issue of law.

102. As has been noted before, the statement by Plaintiff's mother over the telephone was ruled by the MJ to have been hearsay. ROT 667.

103. Petitioner challenged the factual and legal sufficiency of his conviction under Article 134 on appeal. *See* ACM 38934 at 5-9.

104. Stunningly, the AFCCA specifically cited what Petitioner's mother had said over the speakerphone, *evidence which had been ruled to be hearsay* (in fact, in this case, double hearsay) at trial, as evidence supporting the factual and legal sufficiency of the charge:

> "Moments after Appellant uttered the words at issue, over a speaker-phone and after Appellant had exclaimed 'I did it,' his mother revealed the statement from earlier in the day." *Id.* at 8.

105. Had the MJ done anything like that at trial, it would have been immediate grounds for a mistrial.

106. Needless to say, such a grievous error by the AFCCA renders it review of the factual and legal sufficiency of the Article 134 charge neither fully nor fairly considered.

107. The fact that the AFCCA was relying on hearsay evidence when coming to its decision also clearly taints the rest of its ruling.

108. Nor can it be claimed that there are military considerations behind permitting military courts to cite inadmissible evidence in their own opinions.

109. Given this fundamental legal error by the AFCCA, which clearly substantially impacted Petitioner's rights to a proper review of the legal and factual sufficiency of the Article 134 charge against him, Petitioner's conviction under Article 134 for allegedly communicating a threat must be set aside.

**Claim 3:** **Plaintiff's conviction under Article 120(b)(1)(B) must be set aside as legally and factually insufficient because there was zero evidence on the record, even when all inferences are drawn in favor of the prosecution, to suggest that there was a second offensive touching causing KB to engage in a sexual act, as is required under the canons of statutory interpretation of surplusage and *in pari materia*.**

110. Petitioner raised the legal and factual sufficiency of his sexual assault conviction on appeal. *See United States v. Bond*, No. ACM 38934 at 9-10.

111. Petitioner was charged and convicted at trial for having allegedly violated UCMJ Article 120(b)(1)(B) by committing a sexual act on KB through causing bodily harm. Exhibit 2, Report of Result of Trial at 1.

112. There is an error in the Report of Result of Trial, as it recorded the charge as UCMJ Article 120(c)(2), which was the old classification for sexual assault via causing bodily harm under prior versions of the MCM. *Id.*

113. The elements for aggravated sexual assault under Article 120(b)(1)(B) as established under the 2012 MCM were:

> (1) Committing a sexual act upon another person; by
> (2) Causing bodily harm.

114. "Bodily harm" is defined as any offensive touching of another, including nonconsensual sexual acts or contact. Article 120(g)(3).

115. "Sexual act" is defined as contact between the penis and the vulva, defined as "penetration, however slight." Article 120(g)(1)(A).

116. Consent is also explicitly defined as an affirmative defense under Article 120(g)(8).

117. The MJ's trial instructions stated that the elements required to prove the charge were that:

> "(1) That within the state of Texas, between on or about 1 June 2014 and – and on or about 23 June 2014, the accused committed a sexual act upon Kristen Y. Bond, to wit, causing penetration of [KB]'s vulva with his penis, and
>
> (2) That the accused did so by causing bodily harm to [KB], to wit, penetrating the vulva of [KB] with his penis, and
>
> (3) That the accused did so without the consent of [KB]." ROT 942.

118. The UCMJ is, in fact, a statute, as it is Chapter 47 of Title 10 of the United States Code.

119. The avoidance of surplusage is a cardinal rule of statutory interpretation, and this requires interpreting a statute in such a way that "no clause, sentence or word shall be superfluous, void, or insignificant," unless it is impossible to do so. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001).

120. The interpretation of Article 120(b)(1)(B), as stated in the trial instructions, was that nonconsensual penetration of the vulva satisfied the element of "bodily harm" required to show aggravated sexual assault. ROT 942.

13

121. However, penetration of the vulva was already, by definition, covered as part of a separate element, "sexual act." Article 120(g)(1)(A).

122. In addition, the element of consent was also covered by the completely separate element of the affirmative defense of consent to sexual assault charges under Article 120(g)(8).

123. This interpretation of Article 120(b)(1)(B) thus completely rendered the element of "bodily harm" surplusage, as any finding of a "sexual act" would, by necessity, satisfy the element of "bodily harm" (i.e. "any offensive touch of another, however slight" under Article 120(g)(3)), unless specifically defeated by the affirmative defense of consent under Article 120(g)(8).

124. In effect, under this interpretation of the law, any nonconsensual sexual act (i.e. one that satisfies Article 120(g)(1)(A) and defeats Article 120(g)(8)) would, by definition, automatically satisfy the requirement for bodily harm under Article 120(b)(1)(B).

125. This violated the canon of interpretation of surplusage under *Duncan*, as it rendered an entire element of the charge completely superfluous. *See Duncan*, 533 U.S. at 174.

126. In addition, it also completely renders Article 120(b)(1)(A) superfluous as well.

127. That article allows for a finding of aggravated sexual assault when the accused caused another person of any age to engage in a sexual act by threatening or placing that person in fear. Article 120(b)(1)(A).

128. Through the expansive definition of "bodily harm," any sexual act which took place through causing the victim to be in fear would automatically also qualify as a sexual act which occurred through causing bodily harm, as, by that interpretation, a sexual act caused through fear (i.e. a nonconsensual sexual act) would automatically qualify as bodily harm via being an offensive touching of another. *See* ROT 942; *compare* Article 120(b)(1)(A).

129. The Supreme Court precedence, through *Duncan*, clearly requires here, if possible, an interpretation of Article 120(b)(1)(A) and (B) that gives significance to both the required elements of "threatening or placing that other person in fear" and "bodily harm." *See Duncan*, 533 U.S. at 174.

130. It is extremely easy to do so, via interpreting "causing bodily harm" as an independent act of offensive touching which causes the victim to engage in the sexual activity.

131. This interpretation strongly meets the canon of interpretation of *in pari materia*, as it would mirror the structure of Article 120(a), Rape, which, has, as one of its definitions at Article 120(a)(2), causing a person to engage in a sexual act via causing grievous bodily harm (serious bodily harm) to the person.

132.   This is furthered by the definition of "grievous bodily harm" at Article 120(g)(4), which defines it as "serious bodily injury" within the context of fractured bones, deep cuts, serious damage to internal organs, among other injuries.

133.   Article 120(g)(4) even specifically defines minor injuries as excluded from grievous bodily harm, such as black eyes, or a bloody nose, pointing to them falling under the category of harms intended to be included under Article 120 (b)(1)(B).

134.   Article 120(b)(1)(B) is clearly structured as the lesser form of Article 120(a)(2), given that Article 120(b)(1)(A) also mirrors Article 120(a)(3), threatening or placing that other person in fear that any person will be subjected to death, grievous bodily harm, or kidnapping.

135.   In short, both *in pari materia*, and the firm Supreme Court rule via *Duncan* that surplusage must be avoided at all possible, demands a holding that satisfying the necessary elements of Article 120(b)(1)(B) requires finding an independent act of offensive touching which causes the nonconsensual sexual act to occur.

136.   The charge as stated against Petitioner, which instead allowed for the nonconsensual sexual act to satisfy both elements, was thus a clear legal error.

137.   This rendered Petitioner's conviction legally and factually insufficient, an issue raised on appeal, as, even when all reasonable inferences are drawn in favor of the prosecution, and the evidence is viewed in the best possible light to the prosecution, there is nothing to show that there was an offensive touching separate from the nonconsensual penetration.

138.   There is nothing in the record to suggest that KB found any other of the touching by Petitioner, except for the penetration, to be offensive.

139.   The AFCCA failed to apply the proper legal standard, as it continued the violation of binding rules of statutory interpretation by holding that Article 120(b)(1)(B) allowed a nonconsensual sexual act to satisfy the bodily harm element of the charge.

140.   This legal error rendered Petitioner's conviction under Article 120(b)(1)(B) void because the complete lack of evidence was a fundamental legal error that completely erased one of the necessary elements of the Article 120(b)(1)(B) charge. *See Luke v. United States*, 942 F. Supp. 2d 154, 163 (D.D.C. 2013).

141.   In addition, Petitioner did not waive this issue, as he raised it on appeal through challenging the legal and factual sufficiency of the Article 120(b)(1)(B) charge. *See United States v. Bond*, No. ACM 38934 at 9-10.

142.   Once a claim is properly presented, a party may make any argument in support of the claim. *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).

143.   Petitioner's conviction for the charge must thus be vacated.

**Claim 4:** If this Court vacates the Article 120 Sexual Assault conviction, and the Article 134 Wrongfully Communicating a Threat conviction, it should order that Petitioner's characterization of service be upgraded to "general."

144. Petitioner was given a characterization of service of "Dishonorable," which is the worst possible conviction, and carries with it the same loss of rights as those suffered by convicted felons.

145. This was primarily based on his convictions under Article 120 and Article 134, Wrongfully Communicating a Threat.

146. Petitioner plead guilty to the charge under Article 134 of Dishonorably Failing to Pay a Debt.

147. The maximum penalty under the 2012 Manual for Courts Martial for Article 134, Dishonorably Failing to Pay a Debt, is forfeiture of all pay and allowances, a bad conduct discharge, and six months confinement.

148. Given that Petitioner plead guilty to the charge, and the nature of his other convictions, it is extremely unlikely that he would have received a Bad Conduct Discharge for the Article 134, Dishonorably Failing to Pay a Debt conviction.

149. This Court has the authority under 28 U.S.C. § 1361 to compel federal officers or employees to do their duty.

150. This Court should exercise that power by ordering the Secretary of the Air Force to correct Petitioner's records to reflect a General Discharge, with a misconduct reason for separation, and an RE code of 1.

## VI. PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, Petitioner respectfully prays that this Honorable Court issue an order:

(1) Vacating his conviction under UCMJ Article 134, for allegedly wrongfully communicating a threat in June of 2014;

(2) Vacating his conviction under UCMJ Article 120 for allegedly sexually assaulting KB in June of 2014;

(3) Ordering his removal from the sex offender registry;

(4) Compelling the Secretary of the Air Force to change Petitioner's characterization of service to "General" and his reason for separation to "misconduct.";

(5) Awarding Petitioner costs and attorney's fees.

16

(6) Granting all such other relief as the Court may find necessary and proper.

Dated: April 7th, 2022     Respectfully submitted,

/s/DavidPSheldon
David P. Sheldon (DC Bar # 446039)
Law Offices of David P. Sheldon, P.L.L.C.
100 M. St. SE, Suite 600
Washington, DC 20003
Tel: 202.546.9575
Fax: 202.546.0135
*Attorney for Petitioner*